IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL E. ASHBAUGH,  )
    Plaintiff  )
      )
    v.  )    Civil Action No. 08-666
      )
COMMISSIONER OF SOCIAL  )
SECURITY,  )
    Defendant.  )

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the plaintiff's motion for summary judgment (Docket No. 9) be denied; that the defendant's motion for summary judgment (Docket No. 11) be denied; and that this matter be remanded to the Commissioner of Social Security for the reasons explained herein.

II.    Report

Presently before the Court for disposition are cross motions for summary judgment.

On May 19, 2008, Paul E. Ashbaugh, by his counsel, filed a complaint pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§405(g) and 1383(c)(3) for review of the Commissioner's final determination disallowing his claim for a period of disability or for disability insurance benefits and supplemental security income benefits under Sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§416(i) and 423 and 1381 cf.

The plaintiff filed an application for disability and supplemental security income benefits on January 16, 2004 alleging that he had been disabled since October 7, 2003 (R.108-110, 249-252). Benefits were denied on March 10, 2004 (R. 82-86, 254-258). On March 18, 2004, the plaintiff requested a hearing (R. 89), and pursuant to that request a hearing was conducted on March 7, 2005 (R. 755-790). In a decision filed on March 31, 2005, an Administrative Law Judge denied benefits (R. 264-277). On April 7, 2005 the plaintiff requested reconsideration of this determination (R. 285), and upon reconsideration, the Appeals Council remanded the matter on May 4, 2005 for further vocational consideration (R. 281-284). A second hearing was held on October 7, 2005 (R.791-835) and on October 28, 2005, benefits were again denied (R. 52-67).

A second application for benefits was filed on February 28, 2006 again alleging that the plaintiff had been disabled since October 7, 2003 (R. 331-333, 747-751). On July 21, 2006, benefits were denied (R. 753) and another hearing was conducted on February 20, 2007 (R. 836-886). In a decision dated October 23, 2007 benefits were again denied (R. 15-35). On December 21, 2007, the plaintiff requested reconsideration of this determination (R. 13) and in a decision dated March 20, 2008 the Appeals Council affirmed the prior decision (R. 10-12). The instant complaint was filed on May 19, 2008.

In reviewing an administrative determination of the Commissioner, the question before any court is whether there is substantial evidence in the agency record to support the findings of the Commissioner that the plaintiff failed to sustain his/her burden of demonstrating that he/she was disabled within the meaning of the Social Security Act. <u>Richardson v. Perales</u>, 402 U.S. 389 (1971); <u>Adorno v. Shalala</u>, 40 F.3d 43 (3d Cir. 1994).

It is provided in 42 U.S.C. Section 405(g) that:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive....

Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)." Richardson v. Perales, supra., at 401; Plummer v. Apfel, 186 F.3d 422 (3d Cir. 1999).

At the hearings held on March 7, 2005 (R. 755-790), October 7, 2005 (R. 791-835) and February 20, 2007 (R. 836-886), the plaintiff appeared with counsel (R. 757, 793, 838), and testified that he was born on August 16, 1962 (R. 760, 803, 843); that he completed the tenth grade in special education classes (R. 760, 802, 844); that he was receiving public assistance (R. 762, 845) and that he worked as a carpet installer until October 7, 2003 when he suffered a nervous breakdown (R. 763, 802, 847).

The plaintiff also testified that he suffers from diabetes and high blood pressure (R. 765, 766, 855); that he also suffers from knee and back problems (R. 768, 849-850); that his physical conditions would not prevent him from working (R. 820); that he suffered a disabling nervous breakdown on October 7, 2003 (R. 760, 765); that he has memory difficulties, stomach problems and slurred speech and is forgetful (R. 818, 866, 870, 872); that he sees a therapist three times a week for several hours (R. 874); that he takes medication for his various problems (R. 765-768, 821); that he experiences constant depression (R. 774, 880); that he can attend to his personal needs and perform some household chores (R. 768, 769-770, 855, 857-858) and that he tires easily (R. 774-775).

Beth Yesky, the plaintiff's case manager, testified at the second hearing that she helps him with his daily living problems (R. 826-833).

At the first hearing held on March 7, 2005, a vocational expert was called upon to testify (R. 781-789). The witness categorized the plaintiff's prior employ as heavy labor (R. 782). The witness was asked to assume an individual of the plaintiff's age, education and work experience who could only perform simple repetitive tasks not requiring kneeling and only limited interacting with others and concluded while such an individual could not work as a carpet installer, there were a large number of other jobs such a person could perform (R. 785-786). She also testified that such would be the case if the individual was restricted to light or sedentary work (R. 787). However, if the individual had frequent absences from regular consistent work, the witness testified that he would not be employable (R. 788).

The issue before the Court for immediate resolution is a determination of whether or not there is substantial evidence to support the findings of the Commissioner that the plaintiff is not disabled within the meaning of the Act.

The term "disability" is defined in 42 U.S.C. Section 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months....

For purposes of the foregoing, the requirements for a disability determination are provided in 42 U.S.C. Section 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate

area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence ... "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. Section 423(d)(3). These provisions are also applied for purposes of establishing a period of disability. 42 U.S.C. Section 416(i)(2)(A).

It is provided in 42 U.S.C. Section 1382c(a)(3) that:

(A)... an individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

(B) For purposes of subparagraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence ... "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*  *  *

(D) For purposes of this paragraph, a physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

It is also provided that:

> Notwithstanding the provisions of subparagraphs (A) through (E), an individual shall also be considered to be disabled for purposes of this subchapter if he is permanently and totally disabled as defined under a State plan approved under subchapter XIV or XVI of this chapter as in effect for October 1972 and received aid under such plan (on the basis of disability) for December 1973 (and for at least one month prior to July 1973), so long as he is continuously disabled as so defined.

42 U.S.C. Section 1382c(3)(F).

Pursuant to the authorization contained in 42 U.S.C. Section 1382c(3)(D), the Commissioner has promulgated certain regulations for the implementation of the Supplemental Security Income Program. While these statutory provisions have been regarded as "very harsh," nevertheless, they must be followed by the courts. NLRB v. Staiman Brothers, 466 F.2d 564 (3d Cir. 1972); Choratch v. Finch, 438 F.2d 342 (3d Cir. 1971); Woods v. Finch, 428 F.2d 469 (3d Cir. 1970). Thus, it must be determined whether or not there is substantial evidence in the record to support the conclusion of the Commissioner that the plaintiff is not disabled within the meaning of the Social Security Act.

For this purpose, certain medical evidence was reviewed by the Commissioner.

The plaintiff was hospitalized at the Armstrong Memorial Hospital from October 7, 2003 through October 17, 2003 for a major depressive disorder. He was treated with medication (R.157-173).

The plaintiff was treated at the Indiana County Guidance Center between October 20, 2003 and January 12, 2004 for depression. Medication was prescribed (R.187-200).

The plaintiff was treated for depression, high cholesterol and diabetes by Dr. Edward H. Sawicki during the period from January 17, 2003 through January 22, 2004 (R.174-186).

In a residual mental functional capacity assessment completed on March 2, 2004, the plaintiff was noted to have a depressive disorder which was regarded as not significantly to only moderately limiting. His symptomatic claims were only found to be partially credible (R.201-216).

After reviewing the medical evidence and in a residual functional capacity assessment completed on March 4, 2004, it is noted that the plaintiff could occasionally lift one hundred pounds, frequently lift fifty pounds, and stand, walk or sit for about six hours (R.149-154).

In an undated report received on March 26, 2004, the plaintiff was diagnosed with a single episode major depressive disorder and a panic disorder without agoraphobia. Medication was prescribed. The plaintiff's limitations varied between not significant to moderate (R.137-148).

In a report from the Indiana Guidance center concerning the period from February 12, 2004 through April 16, 2004, it was noted that the plaintiff's mental condition had improved and his medication was changed (R.217-222).

The plaintiff was treated for depression at the Community Guidance Center between June 9, 2004 and February 24, 2005 at which time his medications were adjusted (R.231-247).

The plaintiff was treated by Dr. Karthi Namasivayam between May 2, 2005 and June 21, 2005 for depression. He received weekly therapy and medication (R.319-325).

The plaintiff was treated for high cholesterol and diabetes by Dr. Sawicki between October 26, 2004 and June 30, 2005 (R.224-230, 326-330).

The prior denial of benefits became final on October 28, 2005, and consideration of matters prior to October 29, 2005 are barred by res judicata (R.843).

The plaintiff was treated by Dr. Stephan Kowalyk between March 3, 2005 and March 29, 2006 for elevated blood pressure, elevated cholesterol and diabetes (R.406-412).

The plaintiff was treated by Dr. Karthi Namasivayam between November 12, 2003 and April 24, 2006 for depression. He received weekly therapy and medication (R.418-471).

In a report of a psychological evaluation conducted on June 6, 2006, John A. Mills, Ph.D. diagnosed a schizoaffective disorder with an"extremely weak" prognosis. The limitations on the plaintiff were slight to moderate (R.472-479).

The plaintiff was examined by Dr. Duree Ahmed on June 23, 2006 and a diagnosis of uncontrolled diabetes mellitus, hyperlipidemia and depression was made. It was noted that the plaintiff could occasionally lift ten pounds, stand or walk for less than two hours and sit without limitation (R.480-490).

The plaintiff was treated by Dr. Edward H. Sawicki between June 30, 2005 and April 19, 2006 for diabetes, high cholesterol and depression (R.413-417).

After reviewing the medical evidence and in a residual functional capacity assessment completed on July 13, 2006, it is noted that the plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk or sit for about six hours (R.366-372).

In a mental residual capacity assessment completed on July 14, 2006 moderate limitations were noted. A diagnosis of schizoaffective disorder was made but it was concluded that the plaintiff's ailment did not establish the "C" criteria required for the establishment of a disability (R.491-506).

In a vocational evaluation probably completed on September 28, 2006, it was concluded that the plaintiff was unfit for his past work as a carpet installer and was "presently unable to perform any substantial gainful activity" (R.383-386, 548-554).

The plaintiff was treated by Dr. Stephan Kowalyk between January 3, 2005 and October 6, 2006 for diabetes mellitus and hyperlipidemia. His hypertension was controlled and the plaintiff was also taking medication for his bipolar disorder (R.514-547).

The plaintiff was treated by Dr. Jamil Ahmed between May 1, 2006 and January 12, 2007 for back and knee pain, depression and diabetes (R.507-513, 703-709).

In an updated psychological treatment plan completed on January 17, 2007, a diagnosis of bipolar disorder without psychotic features was made. The plaintiff was being treated with medication and therapy (R.710-735).

The plaintiff was treated at the Community Guidance Center between September 5, 2006 and March 19, 2007 with group and individual therapy (R.555-702).

In a report of a psychological evaluation conducted on July 9, 2007, it was concluded that the plaintiff suffered from a schizophrenic disorder of the depressed type. The prognosis was guarded. His activities of general living appeared to be mostly performed independently; his social functioning was very limited and his concentration, persistence and pace were intermittent (R.736-746).

The relevant regulations require explicit findings concerning the various vocational factors which the Act requires to be considered in making findings of disability in some cases. These regulations, published at 20 C.F.R. §§404.1501, et seq., set forth an orderly and logical sequential process for evaluating all disability claims. In this sequence, the Administrative Law

Judge must first decide whether the plaintiff is engaging in substantial gainful activity. If not, then the severity of the plaintiff's impairment must be considered. If the impairment is severe, then it must be determined whether he/she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability. If the impairment does not meet or equal the Listings, then it must be ascertained whether he/she can do his/her past relevant work. If not, then the residual functional capacity of the plaintiff must be ascertained, considering all the medical evidence in the file. The finding of residual functional capacity is the key to the remainder of findings under the new regulations. If the plaintiff's impairment is exertional only, (i.e. one which limits the strength he/she can exert in engaging in work activity), and if his/her impairment enables him/her to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience, made by the Administrative Law Judge coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made. If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the Administrative Law Judge to properly weigh all relevant medical and vocational facts.

> Based on the evidence presented, the Commissioner concluded:
>
> the claimant has the following severe impairments: obesity, schizoaffective disorder, major depression, bipolar disorder, and generalized anxiety disorder ... These impairments are not slight and have more than a *de minimis* effect on the claimant's ability to perform basic work activities...
>
> The claimant also alleged disability due to diabetes ... The claimant's treating primary care physician has generally reported the claimant's diabetes is under good control despite the claimant's intentional disregard of a proper diet and the

physical examinations have show good pedal pulses without any evidence of diabetic retinopathy, acidosis, or significant and persistent disorganization of functioning ...

The claimant also alleged disability ... due to high blood pressure... The evidence shows the claimant has a history of hypertension for which he takes medication and blood pressure readings have shown his hypertension has generally been well controlled... Therefore, this impairment does not have more than a *de minimis* effect on his ability to perform basic work activities...

The evidence also shows the claimant has complained of back and knee pain and has been diagnosed with degenerative joint disease ... Dr. Ahmed concluded the claimant could only lift 10 pounds occasionally, stand and walk five hours, and only perform occasional postural maneuvers ... However, the claimant had full range of motion of the cervical and lumbar spines and all extremities including the knees ... the opinion from Dr. Ahmed is entirely inconsistent with his physical examination and not provided any weight... Therefore, this impairment does not have more than a *de minimis* effect on his ability to perform basic work activities....

* * *

The evidence also shows the claimant has a history of mental health impairments including major depression for which he has been treated at a community guidance center however, the claimant reported in December 2004 he was feeling okay and he denied feeling depressed in February 2005 and Dr. Namasivayam reported that month that the claimant was "doing fairly well from a psychiatric standpoint."...

The mental health progress notes reveal the claimant began to report being more depressed in May 2006 and was complaining of psychotic features including hallucinations. Dr. Namasivayam diagnosed the claimant with major depressive disorder with psychotic features but subsequently reported from June through September 2006 the claimant's condition improved on medications and the claimant continued to do "relatively well" ... A review of the mental status examinations from the partial hospitalization program does not reveal the claimant was experiencing any significant or debilitating symptoms ... Dr. Cseh reported the claimant was "doing relatively well on psychotropic medications and mood stabilizers" ... He diagnosed the claimant with bipolar I disorder, most recently depressed, in partial but not full remission without psychotic features and assessed the claimant with a GAF of 52-54. He subsequently examined the claimant in December and January 2007 and reported the claimant was now 50 percent improved and he assessed the claimant in January 2007 with a GAF of 58-60.

Dr. Dongiovanni performed a psychological examination of the claimant in July 2007 and diagnosed the claimant with schizoaffective disorder (depressed) in addition to a generalized anxiety disorder and assessed him with a GAF of 45. He also administered the Minnesota Multiphasic Personality Inventory–II (MMPI–II) and reported the results were valid. However, the examiner failed to report several important scores known as the "validity scales" such as the VRIN, TRIN, F(B) and F-K scores and failed to mention the "F" scale elevation and low "K" scale which is indicative of an attempt to "fool the test." In addition, the consultative examining psychologist was specifically requested to inquire as to why the claimant's uncle and cousin (with whom he was employed for 19 years) were unwilling to assist claimant in his disability appeal, but failed to address this requested issue. Indeed, the consultative examiner was specifically requested to investigate the fact that the psychiatric progress notes show relatively good mental status examinations and GAF's until the denial of claimant's disability appeal, when he suddenly began reporting new symptoms of audio and visual hallucinations, never before reported. The consultative examiner was specifically requested to investigate the fact that the treating psychiatrist's progress note dated November 15, 2006, noted that the claimant's self-reported audio and visual hallucinations were rather vague and otherwise claimant's reality testing was intact. Finally, the consultative examiner was asked to investigate whether claimant's intentional non-compliance with his diabetic diet and exercise could be an attempt to exacerbate his condition for secondary gain. The consultative examiner failed to address any of the four issues specifically requested.

Accordingly, the Administrative Law Judge must question the impartiality of the consultative psychologist, because of the abject failure to report on issues specifically indicative of symptom exaggeration or poor credibility.

* * *

As to activities of daily living, the evidence shows the claimant experiences mild limitations. The claimant reported in May 2006 he lived in a home with his wife, children and pets who depended on him for care and that he cooked, cleaned, and took his wife to work ...

The claimant testified he can take care of his personal needs ... He also testified he can dust and sweep, washes dishes and do the laundry and can go grocery shopping ... The claimant further testified he can mow the lawn and do yard work, builds puzzles a good bit of the day, glances at the newspaper, does not know how to use the computer, eats at restaurants once a month [depending on finances], and generally goes to church weekly...

As to social functioning, the evidence shows the claimant experiences moderate limitations.

* * *

The claimant testified he wants to be left alone when depressed but did not testify to any other problems in this area of functioning...

As to the third "B" criteria, the evidence shows the claimant experiences moderate limitations...

Finally, as the fourth "B" criteria, the evidence does not reveal the claimant has experienced more than one episode of decompensation of an extended duration.

* * *

As to the "C" criteria ... the evidence does not reveal the claimant experiences a complete inability to function independently outside the area of his home ... the claimant had only "moderate" restrictions interacting appropriately with the public....

The claimant reported on his applications he was limited in his ability to work because he had long periods of anxiety, became nervous, and his hands sweated ... In addition ... the claimant reported he had some problems functioning in a social setting, responding to criticism, planning each day, and completing projects and activities.

The claimant testified he experience right knee and lower back pain and experiences nausea, stomach cramps, and stomach aches in addition to elevated glucose levels but he did not testify to any significant limitations as a result of these impairments ...

However, the clinical and objective findings are inconsistent with an individual experiencing such debilitating symptomatology...

The claimant's activities of daily living are also inconsistent with an individual who experiences debilitating symptoms.

* * *

The Administrative Law Judge notes he has conducted three separate hearings for the claimant and has found the claimant not credible because the claimant's symptoms are consistently exaggerated and always inconsistent with the totality of the evidence.

* * *

> After reviewing the entire record, including the testimony from the claimant in addition to the vocational expert during a previous hearing, the undersigned finds the claimant has the residual functional capacity to engage in work activity widely existing in the local and national economies. Accordingly, the Administrative Law Judge finds the claimant not disabled ... (R.20-35).

The record demonstrates that while the plaintiff has alleges a wide variety of physical bars preventing him from being gainfully employed, the evidence of physical disability is only minimal and clearly does not bar all gainful activity.

The plaintiff's claim of a mental impairment is more severe than any physical claim, and there is evidence in the record that suggests that this impairment prevents him from being gainfully employed. Specifically, following the third hearing on February 20, 2007, the Administrative Law Judge (ALJ) sent the plaintiff to a consultative examiner and on July 9, 2007, Dr. Vito Dongiovanni administered the MMPI–II and performed a clinical interview (R. 739). Dr. Dongiovanni concluded that the scores were valid and that the profile accurately represented the plaintiff's condition (R. 744); he diagnosed schizoaffective disorder (depressed type), generalized anxiety disorder, history of alcohol abuse, rule out borderline intellectual functioning, and assessed a GAF of 45 indicating series deficits in functioning (R. 745). He further stated that:

> His overall condition appears to be chronic and there does not seem to be a significant improvement after apparently years of therapeutic intervention. It is possible that his intellectual functioning is such that generalized improvement might not be seen quickly and he may require continuing and extensive intervention. It is recommend that his intelligence level be assessed [] thoroughly through more formal psychological testing (R. 745).

Dr. Dongiovanni found the plaintiff's ability to perform activities of daily living as independent, but his social functioning was very limited. He also stated that he would "have difficulty sustaining attention for significant periods of time" and that his "concentration level is

subject to variability." (R. 746.) Significantly, Dr. Dongiovanni assessed marked restrictions due to the plaintiff's depression, anxiety and concentration difficulties in three areas: making judgments on simple work-related decisions, ability to respond appropriately to work pressures in a usual setting and ability to adequately respond to changes in a routine work setting (R. 737).

The ALJ rejected these conclusions from Dr. Dongiovanni's report. As quoted above, he found that Dr. Dongiovanni had failed to report certain "validity scales," that he failed to mention the "F" scale elevation and low "K" scale indicative of an attempt to "fool the test"; that he failed to address four specific issues that he had been directed to answer; and finally, the ALJ concluded that Dr. Dongiovanni was not impartial because he had failed to report on issues specifically indicative of symptom exaggeration or poor credibility. (R. 24-25). Plaintiff challenges each of these conclusions as improper.

"The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000). The ALJ should not have analyzed the data from the MMPI–II and concluded that the plaintiff was trying to "fool the test." Rather, he should have returned the matter to Dr. Dongiovanni to examine the "validity scales," perform the "F minus K evaluation" and otherwise address the issue of whether the test results supported a conclusion that the plaintiff was being truthful. Indeed, Dr. Dongiovanni specifically concluded that the test results were valid and that the profile accurately represented the plaintiff's condition

The defendant argues that the ALJ's "understanding of the F and K scales is supported by medical literature." (Def.'s Br. at 11 n.9, 16.) However, a reviewing court has "no authority to supply a ground for the agency's decision." O'Connor v. Sullivan, 983 F.2d 70, 73 (7th Cir.

1991). See also Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001). The ALJ did not cite to any "medical literature" in support of his conclusion. Thus, neither the defendant nor this Court can cite to the "medical literature" to determine whether the ALJ properly performed the "F minus K evaluation," which he should not have undertaken for the reason cited above.

Similarly, the ALJ should not have drawn negative inferences from Dr. Dongiovanni's failure to answer four specific questions that the ALJ states he asked the doctor to answer. As the plaintiff notes, it might be that Dr. Dongiovanni never received these questions or perhaps there is some other explanation. In any event, the ALJ did not return the matter to Dr. Dongiovanni for an explanation or for further analysis. Instead, he drew negative inferences from the lack of data and, from the plaintiff's perspective, he drew the most negative inference possible: that Dr. Dongiovanni had decided not to answer the questions because they would have undermined the plaintiff's credibility and he questioned Dr. Dongiovanni's impartiality in this matter. This is a remarkable conclusion that is not supported in the record.[1]

Plaintiff also argues that the ALJ should not have relied on vocational testimony from the first hearing, over two years old, particularly when a vocational expert was present at the third hearing and when circumstances had changed between 2005 and 2007. Vocational experts were present at all three hearings, but the ALJ took testimony only at the first hearing on March 7, 2005. Thus, by the time the third hearing was held on February 20, 2007, more than two years had elapsed, during which Dr. Dongiovanni issued his report, the plaintiff suffered a decline in

---

1. Indeed, consultative examiners only meet the claimants on one occasion. If anything, one might imagine that they would be biased in favor of the Social Security Administration, which pays their bills and might be more inclined to send them further referrals if their reports support a denial of benefits. This is not to say that Dr. Dongiovanni could not have been biased in favor of the plaintiff, only that such an extraordinary conclusion must be supported by evidence.

his condition with a GAF of 30 in May 2006, he began a partial hospitalization program in September 2006 and he experienced a decline in functioning again in February 2007 as evidenced by a recurrence of GAFs of 50.

A hypothetical question posed to a vocational expert must accurately reflect all of a claimant's limitations as of the time of the hearing. Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002). In addition, the limitation to "simple repetitive one-two steps tasks" was deemed vague by the court in Burns. The ALJ erred by not taking new testimony from the vocational expert who was present at the third hearing and which would have incorporated the plaintiff's more recent events. On remand, the Commissioner should take new vocational testimony.

Ordinarily, when a case is remanded to the Commissioner, it is sent back to the ALJ who is familiar with the case, who is assumed to be fair and impartial. However, in his decision, the ALJ stated that "he has conducted three separate hearings for the claimant and has found the claimant not credible because the claimant's symptoms are consistently exaggerated and always inconsistent with the totality of the evidence." (R. 32.) He also drew numerous negative inferences against the plaintiff, such as concluding that his uncle and cousin have declined to assist him in his application for benefits because they do not believe he is entitled to them and that he began reporting hallucinations after his applications for benefits were denied in an attempt to obtain befits (R. 32). Although these explanations might be accurate, they are not the only ones that can be drawn from the record, and there is no evidence in the record to support these negative inferences. Under the circumstances, it seems advisable to have "fresh eyes on the case," United States v. Wecht, 541 F.3d 493, 511 (3d Cir. 2008). Therefore, upon remand, the Commissioner should assign this matter to another ALJ.

Summary judgment is appropriate where there are no material issues of fact in dispute and the movant is entitled to judgment as a matter of law. <u>Biener v. Calio</u>, 361 F.3d 206 (3d Cir. 2004). In the instant case, there are material factual issues in dispute relating to the extent of the plaintiff's mental impairment and its impact upon his ability to be gainfully employed and the vocational evidence is insufficient to conclude that the plaintiff can perform the range of jobs as indicated by the Commissioner. Therefore it is recommended that the plaintiff's motion for summary judgment be denied; that the defendant's motion for summary judgment be denied; and that this matter be remanded to the Commissioner of Social Security for further analysis of the issues described herein.

Within ten (10) days after being served with a copy , any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


Dated: November 25, 2008				Robert C. Mitchell,
						United States Magistrate Judge